# Exhibit 1



**Capitol Corporate Services, Inc.**
PO Box 1831
Austin, TX 78767
Phone: (800) 345-4647  Fax: (800) 432-3622
rassop@capitolservices.com

# Service Of Process Transmittal Notice

| | | |
|---|---|---|
| LEGAL OPERATIONS<br>ALTRIA CLIENT SERVICES LLC<br>6601 W BROAD ST<br>RICHMOND VIRGINIA 23230 | **Date Processed:** | 10/30/2020 |
| | **Completed By:** | LEANNE JENSEN |
| | **Delivery Method to Client:** | FEDEX 2 DAY LETTER |
| | **Tracking Number:** | 137232993003 |

Enclosed please find legal documents received on behalf of the client named below. These documents are being forwarded in accordance with your instructions.

| **Date / Time Received**<br>10/30/2020 10:30 AM in MASSACHUSETTS | **Transmittal #**<br>MA-195027 | **Delivered to Agent by**<br>PROCESS SERVER |
|---|---|---|

**With Regard to Client**

PHILIP MORRIS USA INC.

**Title of Case or Action**

PATRICIA FITZGERALD, ET AL V. PHILIP MORRIS USA, INC. ET AL

| **Case Number**<br>2081CV02586 | **Type of Document Served**<br>CITATION/SUMMONS |
|---|---|

**Court Name**

TRIAL COURT OF THE COMMONWEALTH SUPERIOR COURT DEPARTMENT MIDDLESEX

**Note**

1-195027I

# Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2081CV02586

A TRUE COPY ATTEST
DAVID D. AYLES, PROCESS SERVER
AND DISINTERESTED PERSON

Patricia Fitzgerald, et al _____ , PLAINTIFF(S),

V.

Philip Morris USA, Inc., et al _____ , DEFENDANT(S)

**SUMMONS**

THIS SUMMONS IS DIRECTED TO ___ Philip Morris USA, Inc. ___ . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the ___ Middlesex Superior ___ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
   a. Filing your **signed original** response with the Clerk's Office for Civil Business, Superior ___ Court, Middlesex 200 Trade Center Woburn, MA 01801(address), by mail or in person, **AND**
   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: 360 Huntington Ave #117CU, Boston, MA 02115 ___ .

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rules of court.

4. **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _____ , 20 ___ .

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , 20 ___ , I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____ , 20 ____     Signature:_____

**N.B.     TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

10/30 , 20 20

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT
DOCKET NO.

---

PATRICIA FITZGERALD and THOMAS
FITZGERALD,

     Plaintiffs,

v.

R.J. REYNOLDS TOBACCO COMPANY,
PHILIP MORRIS USA, INC., and
DEMOULAS SUPER MARKETS, INC.,

     Defendants.

---

10/26/2020

NH

**RECEIVED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

### *Nature of the Action*

1.  Plaintiffs Patricia Fitzgerald and Thomas Fitzgerald bring this action for damages arising out of Patricia Fitzgerald's injuries caused by Defendants' conduct. In approximately April 2019, Patricia Fitzgerald was diagnosed with lung cancer. Mrs. Fitzgerald developed this disease as a result of smoking cigarettes manufactured by R.J. Reynolds Tobacco Company and its predecessors in interest, including but not limited to Winston, True, and Newport brand cigarettes, and cigarettes manufactured by Philip Morris USA, Inc. and its predecessors including but not limited to Parliament, Marlboro, and Chesterfield brand cigarettes, for a total of approximately 40 years, starting when Patricia Fitzgerald was approximately 13 years old and continuing until approximately 2006.

2. During the time Patricia Fitzgerald smoked Parliament, Marlboro, and Chesterfield brand cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed, and/or sold by Defendant Philip Morris USA, Inc. ("Philip Morris") and/or its predecessors in interest. Parliament, Marlboro, and Chesterfield brand cigarettes were defective and unreasonably dangerous and should not have been sold and/or sampled to Patricia Fitzgerald at any time.

3. During the time Patricia Fitzgerald smoked Winston, True, and Newport brand cigarettes, they were designed, tested, manufactured, marketed, promoted, distributed, and/or sold by Defendant R.J. Reynolds Tobacco Company ("R.J. Reynolds") and/or its predecessors in interest. Winston, True, and Newport brand cigarettes were defective and unreasonably dangerous and should not have been sold and/or sampled to Patricia Fitzgerald at any time.

4. Philip Morris, R.J. Reynolds, and their predecessors in interest knew before Patricia Fitzgerald began smoking that smoking their cigarettes was a cause of a variety of potentially fatal diseases and that the nicotine contained in their cigarettes was a highly addictive drug.

5. At all times material hereto, Philip Morris, R.J. Reynolds, Brown and Williamson, American Tobacco Company, Lorillard Tobacco Company, and Liggett and Myers conspired to conceal and misrepresent the addictive nature and adverse health consequences of smoking cigarettes.

6. Since the 1950s, Philip Morris, R.J. Reynolds, their lawyers, and other cigarette manufacturers, having created industry trade organizations such as the Tobacco Industry Research Committee ("TIRC"), the Council for Tobacco Research U.S.A., Inc. ("CTR"), and the Tobacco Institute, Inc. ("TI"), publicly pledged "to aid and assist research into tobacco use and health." Contrary to such public statements, Philip Morris, R.J. Reynolds, their

lawyers, and their trade organizations actually did everything they could to misrepresent, conceal, and distort information about the negative health consequences of smoking their cigarettes.

7. During the time Patricia Fitzgerald smoked cigarettes, Philip Morris, R.J. Reynolds, as well as their lawyers, their trade organizations, and other cigarette manufacturers who aided and abetted them, consistently engaged in public relations campaigns to mislead, confuse, and deceive the public, including Mrs. Fitzgerald, as to the dangerousness of cigarettes and the addictive quality of nicotine delivered by cigarettes.

8. Defendants' co-conspirators included attorneys and law firms who initiated and oversaw actions in furtherance of the conspiracy. These lawyers, acting through a Committee of Counsel, actually presided over the conspiracy to address the three most important threats to the industry – litigation, politics, and public opinion. For example, lawyers for Defendants and the other cigarette manufacturers initiated and oversaw CTR "Special Projects" – an elaborate program conceived and directed by industry representatives, including industry lawyers, to support scientists who had shown a willingness and ability to help undermine the medical consensus that cigarettes caused diseases and provide testimony that would bolster the industry's position before the courts and governmental bodies. The Defendants' lawyers reviewed and edited scientific documents to ensure that no damaging information was disclosed to the public nor retained in company files. The "committee of counsel" and an associated "ad hoc committee" orchestrated the industry's denial campaign and worked to ensure that all threats against the continued sale of deadly and addictive cigarettes were neutralized.

9. Internal documents from Philip Morris and R.J. Reynolds, as well as the internal documents of their co-conspirators, show that they knew for decades that nicotine is an addictive drug and that their cigarettes were a vehicle for the delivery of nicotine. Reports aimed at determining the "optimum nicotine/tar ratio" to produce "the most favorable physiological and behavioral responses" tied nicotine delivery directly to Philip Morris' market position. Further records from the 1970s show that the Defendants and other cigarette manufacturers knew that the user's primary motivation for smoking cigarettes was to obtain the effects of nicotine. Philip Morris' and R.J. Reynolds' research confirmed, and their internal communications acknowledged, that addiction can be intensified through adjustment and manipulation of the "attractive dosage forms" of nicotine in cigarettes and the method of nicotine delivery. Philip Morris, R.J. Reynolds, and other cigarette manufacturers used this information to manipulate the nicotine delivery of their cigarettes so as to initiate and maximize addiction in smokers such as Mrs. Fitzgerald.

10. Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers also knew for decades that most smokers, like Patricia Fitzgerald, began smoking as children or teenagers. Despite this knowledge and with knowledge that cigarette smoking is addictive and hazardous to one's health, Philip Morris, R.J. Reynolds, and other cigarette manufacturers employed marketing techniques and themes designed to attract children and teenagers to smoking.

11. Throughout Mrs. Fitzgerald's smoking years, Defendant Demoulas Super Markets, Inc. ("Demoulas") sold Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes to consumers, including Patricia Fitzgerald. The cigarettes that Demoulas sold to

Patricia Fitzgerald were defective and unreasonably dangerous and should not have been sold to her at any time.

12. Plaintiff Patricia Fitzgerald seeks compensatory and multiple damages for the wrongful conduct alleged in this Complaint, which proximately caused her to become addicted to Defendants' cigarettes, to develop lung cancer, to incur significant medical expenses, and to endure enormous pain and suffering. Her husband Thomas Fitzgerald seeks damages for loss of consortium.

*The Parties*

13. At all relevant times, Plaintiffs Patricia Fitzgerald and Thomas Fitzgerald were citizens of the Commonwealth of Massachusetts and are residents of Reading, Massachusetts.

14. Defendant Philip Morris is a Virginia corporation that conducts business in the Commonwealth of Massachusetts. Philip Morris manufactures, advertises, and sells cigarettes throughout the United States, including the Commonwealth of Massachusetts. During the time Patricia Fitzgerald smoked Parliament, Marlboro, and Chesterfield brand cigarettes, Philip Morris and/or its predecessors in interest manufactured, advertised, and sold such cigarettes throughout the United States, including the Commonwealth of Massachusetts.

15. Defendant R.J. Reynolds is a North Carolina corporation that conducts business in the Commonwealth of Massachusetts. R.J. Reynolds is the successor by merger or acquisition to, and succeeded to the liabilities of, Lorillard Tobacco Company, Brown & Williamson Tobacco Corporation, and American Tobacco Company. During the time that Patricia Fitzgerald smoked Winston, True, and Newport brand cigarettes, R.J. Reynolds and/or its predecessors in interest manufactured, advertised, and sold such cigarettes throughout the

United States, including the Commonwealth of Massachusetts. References below to "R.J. Reynolds" or the "Defendants" includes R.J. Reynolds' predecessors, where the sense requires.

16. Defendant Demoulas is a Massachusetts corporation with its principal and/or usual place of business in Middlesex County, Massachusetts, at the address: 875 Main Street, Tewksbury, MA, 01876. It sold cigarettes to Patricia Fitzgerald in the Commonwealth of Massachusetts.

## *Jurisdiction and Venue*

17. Defendants have, since before Patricia Fitzgerald began smoking cigarettes, continuously done business in the Commonwealth of Massachusetts; made contracts to be performed in whole or in part in the Commonwealth; manufactured, tested, sold, offered for sale, supplied, and/or placed cigarettes in the stream of commerce, or in the course of their business, materially participated with others in so doing; and performed such acts as were intended to and did result in the sale and distribution of cigarettes in the Commonwealth from which all Defendants derived substantial revenue, directly or indirectly. All Defendants also caused injury by acts or omissions in the Commonwealth and/or caused injury in the Commonwealth by acts or omissions outside the Commonwealth.

18. This Court has jurisdiction over the subject matter of this action pursuant to G.L. c. 212, § 4. This Court has personal jurisdiction over Defendants pursuant to G.L. c. 223A, §§ 2 and 3.

19. Venue is proper in Middlesex County pursuant to G.L. c. 223 §§ 7 and 8(4).

## *Factual Background*

20. Patricia Fitzgerald, who was born in 1954, began smoking cigarettes when she was approximately 13 years old. As a teenager, Patricia was given free samples of cigarettes, including but not limited to, Marlboro, Winston, and Newport cigarettes in or around areas

of New Hampshire. Throughout her life, Patricia smoked Philip Morris' Parliament, Marlboro, and Chesterfield brand cigarettes and R.J. Reynolds' Winston, True, and Newport brand cigarettes. Patricia purchased her cigarettes regularly from Demoulas stores.

21. Patricia Fitzgerald became addicted to the nicotine in the cigarettes she smoked and continued to smoke approximately one to two packs per day for decades thereafter.

22. Patricia Fitzgerald struggled to overcome her addiction to nicotine for many years. She attempted a variety of methods to quit. Despite numerous attempts, Mrs. Fitzgerald was not able to stop smoking until approximately early 2006.

23. In approximately April 2019, Patricia Fitzgerald was diagnosed with lung cancer that was caused by smoking Defendants' cigarettes.

24. Patricia Fitzgerald has undergone numerous treatments in an effort to fight her lung cancer and halt its spread through her body, including chemotherapy and radiation. Her treatments have incurred significant expense and have rendered her unable to go about her normal daily activities, including being fully present in the lives of her husband and children. These treatments have taken an enormous physical and emotional toll on Patricia Fitzgerald and her family.

25. Plaintiff Thomas Fitzgerald has been deprived of the full care, comfort, society, and companionship of his wife, Patricia, as a result of the injuries that she sustained arising from the Defendants' negligence and other wrongful acts or omissions. He demands judgment against all Defendants in an amount just and appropriate together with interest and costs.

26. Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes were defective and unreasonably dangerous and should not have been sold and/or sampled to consumers, including Patricia Fitzgerald, at any time.

27. Philip Morris and R.J. Reynolds purposely manipulated and controlled the tar and nicotine content and delivery methods of their tobacco products, including Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes, to create and maintain smokers' addiction to cigarettes.

28. At all times relevant to this Complaint, Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers knowingly made material misrepresentations to the public, including Patricia Fitzgerald, about the link between smoking and various diseases and the addictive properties of nicotine.

29. By the early 1960s, Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers acknowledged internally that smokers were addicted to nicotine delivered by cigarettes and that the tar in cigarette smoke causes cancer.

30. Philip Morris and R.J. Reynolds purposely joined with other cigarette manufacturers and trade organizations in the tobacco industry in order to mislead the public regarding the health consequences of cigarettes and the addictiveness of nicotine and to fraudulently represent to the public that there was no scientific consensus on the addictiveness and negative health consequences of cigarettes.

31. Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers have also known since before Patricia Fitzgerald began smoking that cigarettes cause human diseases, including cancer, and contain numerous chemicals that intensify the dangers of smoking. Despite that knowledge, Philip Morris and R.J. Reynolds, directly and through their lawyers, their trade organizations, and other cigarette manufacturers, misrepresented, concealed, and/or failed to disclose to the public and to Patricia Fitzgerald the true facts about the health hazards of smoking cigarettes, including

Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes, such as their highly addictive qualities.

32. Philip Morris and R.J. Reynolds, along with their lawyers, their trade organizations, and other cigarette manufacturers, engaged in a deliberate and decades-long misrepresentation, concealment of, and/or failure to disclose the true facts and health consequences of smoking, disease, and addiction that deprived Mrs. Fitzgerald of the ability to make an informed decision about smoking Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes.

33. Among other misrepresentations, Philip Morris and R.J. Reynolds specifically misrepresented the safety of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes for the express purpose of keeping Patricia Fitzgerald and others as their customers, including by doing the following:

   a. Philip Morris and R.J. Reynolds intentionally, recklessly, knowingly, and/or willfully conveyed through the addition of health descriptors such as "Filter," "Filters," or "Filtered" to various brands of their cigarettes smoked by Patricia Fitzgerald that such cigarettes minimized or reduced the risks of smoking by reducing tar and/or nicotine delivery in order to convince customers like Patricia Fitzgerald not to quit smoking;

   b. Philip Morris and R.J. Reynolds intentionally, recklessly, knowingly, and/or willfully conveyed through the addition of descriptors such as "Light," "Lights," "Ultra Light," "Ultra Lights," and "Low Tar" to various brands of their cigarettes smoked by Patricia Fitzgerald that those cigarettes minimized or reduced the risks of smoking by reducing tar and nicotine delivery in order to convince customers like Patricia Fitzgerald not to quit smoking;

   c. Philip Morris and R.J. Reynolds knew or should have known that the implicit health reassurance message conveyed by the descriptors such as "Filter," "Filters," "Filtered," "Light," "Lights," "Ultra Light," "Ultra Lights," and "Low Tar" on various brands of their cigarettes smoked by Patricia Fitzgerald were not justified by any scientific research it had conducted prior to the time it first made those claims in the 1970s; and, in fact, in many cases, smokers of those cigarettes with those descriptors were getting as much or more tar and nicotine than brands of cigarettes without those descriptors; and

d. Philip Morris and R.J. Reynolds continued to use the misleading descriptors "Filter," "Filters," "Filtered," "Light," "Lights," "Ultra Light," "Ultra Lights," and "Low Tar" on certain varieties of their cigarettes until the early 2000s, despite the fact that they did not offer a health benefit and, in many cases, smokers of those cigarettes with those descriptors were getting as much or more tar and nicotine than brands of cigarettes without those descriptors.

34. False public statements by Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers were made with the expectation that consumers, including Patricia Fitzgerald, would rely on such statements in making decisions about whether to start or to continue smoking cigarettes. For example, Brennan Dawson, Vice President of Public Relations for the Tobacco Institute, a trade association formed by and for the major tobacco manufacturers for the purpose of providing misleading information concerning the dangers of cigarette use, and Walker Merryman, another Tobacco Institute spokesperson, both stated that the Tobacco Institute had intended for consumers to rely on the public statements they made on television, and elsewhere, concerning the danger of cigarettes.

35. Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers continued their campaign of misrepresentation and concealment long after they became internally aware of the health consequences of smoking.

36. As a result of the false public statements on the health consequences of smoking made by Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers, Patricia Fitzgerald began smoking cigarettes as a minor, and became addicted to them.

## COUNT I
### *Breach of Warranty – Defective Design*
(Against All Defendants)

37. Plaintiffs restate and incorporate herein the foregoing paragraphs of their Complaint.

38. At all relevant times, Philip Morris, R.J. Reynolds, and Demoulas engaged in the business of manufacturing, testing, designing, advertising, marketing, packaging, selling, and/or distributing Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes, and placing these cigarettes into the stream of commerce in Massachusetts.

39. Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes were expected to and did reach Patricia Fitzgerald in substantially the same condition they were in when originally manufactured, distributed, and/or sold by Philip Morris, R.J. Reynolds, and re-sold by Demoulas.

40. Philip Morris, R.J. Reynolds, and Demoulas, as the manufacturers, sellers, marketers, and/or distributors of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes, impliedly warranted that such cigarettes were merchantable and fit for the ordinary purposes for which they were intended.

41. Philip Morris, R.J. Reynolds, and Demoulas breached this warranty because the Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes they manufactured, sold, and/or distributed to Patricia Fitzgerald and other members of the public were defective and unreasonably dangerous to users and consumers.

42. Such cigarettes were carcinogenic, addictive, and contained dangerous levels of tar, nicotine, and other dangerous substances. The foreseeable risks posed by Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes could have been reduced or

eliminated by Philip Morris' and Reynolds' adoption of safer reasonable alternative designs that were technologically and commercially available and feasible.

43. At all times relevant to this Complaint, Patricia Fitzgerald used and consumed Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes designed, manufactured, sold, and/or distributed by Philip Morris, R.J. Reynolds, and Demoulas in the manner in which Philip Morris, R.J. Reynolds, and Demoulas intended and expected such cigarettes to be used.

44. As a direct and proximate result of Philip Morris', R.J. Reynolds', and Demoulas' breach of warranty, Patricia Fitzgerald contracted lung cancer resulting in pain and suffering, mental anguish, expense of medical and/or nursing care and treatment, lost earning, and other losses for which Plaintiffs are entitled to recover the damages sought in this Complaint.

## COUNT II
### *Breach of Warranty – Failure to Warn*
(Against Philip Morris & R.J. Reynolds)

45. Plaintiffs restate and incorporate herein the foregoing paragraphs of their Complaint.

46. R.J. Reynolds and Philip Morris engaged for many years in the business of manufacturing, testing, designing, advertising, marketing, packaging, selling, and/or distributing cigarettes, including Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes and placing them into the stream of commerce in Massachusetts.

47. The cigarettes sold by R.J. Reynolds and Philip Morris were expected to and did, in fact, reach Patricia Fitzgerald in substantially the same condition they were in when originally manufactured, distributed, and sold by R.J. Reynolds and Philip Morris.

48. R.J. Reynolds and Philip Morris, as the manufacturers, sellers, marketers, and/or distributors of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes,

impliedly warranted that Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes were merchantable and fit for the ordinary purposes for which they were intended.

49. R.J. Reynolds and Philip Morris breached this warranty prior to July 1969, because they failed to give users and consumers of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes prior to July 1969, including Patricia Fitzgerald, an adequate warning of the health hazards and addictive properties of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes, all of which were known, or should have been known, to R.J. Reynolds and Philip Morris.

50. R.J. Reynolds and Philip Morris breached this warranty because the Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes manufactured, sold, and distributed by R.J. Reynolds and Philip Morris to Patricia Fitzgerald and other members of the public were defective and unreasonably dangerous to users and consumers, because:

   a. Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes were carcinogenic, addictive, and contained dangerous levels of tar, nicotine, and other dangerous substances; and

   b. The duty and urgency of providing an adequate warning of the health hazards and addictive properties of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes were substantially heightened by the need to correct and counteract the aforesaid deceit, concealment, misinformation, and advertising propaganda promulgated by R.J. Reynolds and Philip Morris.

51. R.J. Reynolds' and Philip Morris' failure to disclose through an adequate warning the true facts about addiction and the risk of disease from smoking Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes had caused damages for Patricia Fitzgerald.

52. Had an adequate warning about Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes been given by R.J. Reynolds and Philip Morris, Patricia Fitzgerald would have never started smoking.

53. At all times relevant to this Complaint, Patricia Fitzgerald used and consumed the Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes manufactured, sold, and distributed by R.J. Reynolds and Philip Morris in the manner in which Defendants intended and expected such cigarettes to be used.

54. As a direct and proximate result of R.J. Reynolds' and Philip Morris' breach of warranty, Patricia Fitzgerald contracted cancer resulting in pain and suffering, mental anguish, expense of medical and nursing care and treatment, and other losses for which Plaintiffs are entitled to recover in this Complaint.

COUNT III
*Negligence*
(Against Philip Morris and R.J. Reynolds)

55. Plaintiffs restate and incorporate herein the foregoing paragraphs of their Complaint.

56. Philip Morris and R.J. Reynolds owed Patricia Fitzgerald a duty to exercise reasonable care in the design, development, manufacturing, testing, marketing, advertising, promotion, packaging, sale, and/or distribution of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes.

57. Philip Morris and R.J. Reynolds failed to exercise reasonable care in the design, development, manufacturing, testing, marketing, advertising, promotion, packaging, sale, and/or distribution of Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes.

58. Philip Morris and R.J. Reynolds knew or should have known that, when used as intended, such cigarettes would cause human disease. Philip Morris and R.J. Reynolds also knew or should have known that, when used as intended by consumers, smoking Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes would likely lead to addiction and dependence.

59. At all times relevant to this Complaint, it was illegal to sell cigarettes to persons under the age of 18. Despite this, Philip Morris and R.J. Reynolds deliberately marketed and/or distributed their cigarettes, including Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes, in a manner calculated to induce purchases and use of their cigarettes by minors, whose use would involve an unreasonable risk of injury. Patricia Fitzgerald was one of those consumers who began smoking as a minor. Philip Morris and R.J. Reynolds breached their duty to exercise reasonable care in numerous respects, including, but not limited to, through the free giveaways of cigarettes to minors, such as Patricia Fitzgerald, in the state of New Hampshire.

60. Philip Morris and R.J. Reynolds themselves, and through their lawyers, trade associations, and other cigarette manufacturers, also negligently misrepresented to Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes were not carcinogenic or addictive. Philip Morris, R.J. Reynolds, their trade organizations, their lawyers, and other cigarette manufacturers knew or should have known of the falsity of such representations.

61. As a direct and proximate result of Philip Morris' and R.J. Reynolds' negligence, Patricia Fitzgerald developed lung cancer resulting in pain and suffering, mental anguish, expense of medical and/or nursing care and treatment, and other losses for which Plaintiffs are entitled to recover the damages sought in this Complaint.

*Civil Conspiracy*
(Against Philip Morris and R.J. Reynolds)

62. Plaintiffs restate and incorporate herein the foregoing paragraphs of their Complaint.

63. Philip Morris and R.J. Reynolds, themselves and through their predecessors in interest, engaged in a "Concerted Action" conspiracy. Philip Morris and R.J. Reynolds acted in concert and joined together in a conspiracy with other manufacturers, industry lawyers, and trade organizations in the tobacco industry in an unlawful and unfair manner, pursuant to a common design, to deliberately misrepresent and conceal both the health consequences and addictive qualities of cigarettes and the state of scientific knowledge on those subjects, and to conceal or omit information regarding those subjects, with the intention that consumers, including Patricia Fitzgerald, would rely on this false information.

64. Each conspirator knew or, in the exercise of reasonable care, should have known about the conduct of the others and about the common tortious scheme.

65. Philip Morris and R.J. Reynolds, themselves and through their predecessors in interest, also engaged in a "True Conspiracy." Philip Morris and R.J. Reynolds acted in unison and by force of numbers with other tobacco companies, industry lawyers, and trade organizations, to overwhelm the will of consumers, including Patricia Fitzgerald.

66. Philip Morris, R.J. Reynolds, their legal counsel, their trade organizations, and other cigarette manufacturers engaged in numerous overt acts in furtherance of the conspiracy. Such acts included, but were not limited to:

   a. A meeting between Philip Morris, R.J. Reynolds, and their co-conspirators in 1953 to form the Tobacco Institute Research Committee ("TIRC"), eventually renamed the Council for Tobacco Research ("CTR"), an organization which claimed its purpose was to promote "independent" research on cigarette dangers, but which instead was

used by Philip Morris, R.J. Reynolds, and its co-conspirators to disseminate misleading information about the dangers of smoking;

b. Meetings over the years of TIRC and its successor organization CTR, where the co-conspirators discussed and acted upon their above stated goals;

c. TIRC-funded research studies, which avoided the issue of cancer and addiction, and instead focused on other matters, while giving the impression to the public that the "cancer question" was under "investigation";

d. The subsequent creation of the Tobacco Institute, an organization formed for the purpose of providing misleading information concerning the dangers of cigarette use to the media and others, of which Philip Morris, R.J. Reynolds, and their co-conspirators were members;

e. The suppression of and refusal to publish various research studies carried out by co-conspirators which revealed smoking to be both harmful and addictive;

f. The Tobacco Institute issued publications and news releases, made telephone calls, and contacted the media, government, and others suggesting the presentation of the "other side" of the "health controversy" about cigarettes, and urged the media to quote tobacco industry sources when reporting on scientific developments showing the dangers of cigarettes smoking. These suggestions were accompanied by references to the amount of advertising carried in the magazine or newspaper and threats that such advertising would be dropped if the magazine did not comply;

g. The publication in 1954 by Philip Morris, R.J. Reynolds, and their co-conspirators, through TIRC, of "A Frank Statement to Cigarette Smokers." The "Frank Statement" promised the public that Philip Morris, R.J. Reynolds, and their co-conspirators would do research to reveal the true dangers of cigarettes smoking;

h. Following the publication of " A Frank Statement to Cigarette Smokers" and for many decades thereafter, numerous public statements were made by Philip Morris, R.J. Reynolds, and their co-conspirators that falsely criticized scientific publications and reports that showed that cancer and other diseases were caused by cigarette smoking;

i. A statement on April 14, 1954, by the TIRC in "A Scientific Perspective on the Cigarette Controversy" that its members had adopted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business," and a promise on July 1, 1954, to share its research findings on smoking and disease with the public;

j. Statements and publications by Clarence Cook Little, spokesman for TIRC, to the effect that scientific evidence showing the dangers of cigarette smoking were "not proven" or were "merely statistical." These statements included, but were not limited to, statements made in *Atlantic* magazine in 1957, which were made with an intent to deceive the public into believing cigarette smoking was safe;

k. A December 16, 1957, press release from TIRC falsely stating that "[n]o substance has been found in tobacco smoke known to cause cancer in human beings";

l. "Research Reports on Tobacco and Health," generated on behalf of the co-conspirators by the Tobacco Institute and published for many years, which falsely

claimed that there was scientific doubt concerning the known health consequences of smoking. These releases reported on fringe medical theories of causes of cancer other than cigarettes, in order to assuage the public's fear regarding the deadly consequences of smoking cigarettes. These theories, as reported by the Tobacco Institute on behalf of Philip Morris, R.J. Reynolds, and their co-conspirators included, but were not limited to, that smoking lowers fatty substances in the lungs, that lung cancer is caused by a certain personality, and that emphysema is an outcome of childhood measles;

m.  The commentary in the Annual Reports put out by TIRC that uniformly challenged the hypothesis that smoking was linked to lung cancer and emphasized that data regarding smoking and health was controversial, contradictory, and inconclusive;

n.  A false statement on July 6, 1961, by Tobacco Institute President George Allen in a press release that "The tobacco industry itself is more interested than anyone else in finding out and making public the true facts about tobacco and health," and a further false statement that "research in recent years has produced findings that weaken rather than support the claim that smoking is a major contributor to lung cancer";

o.  A false statement on March 14, 1963, by Tobacco Institute President George Allen in a press release that "Scientific opinions differ widely. Many scientists say that more must be learned before it will be known whether any of the factors now under study, including smoking, has a role in causation of diseases such as lung cancer, and, if so, whether that role is direct or indirect, primary or incidental. In the opinion of these scientists, singling out tobacco as a major factor is not warranted by scientific knowledge";

p.  An internal memorandum dated January 29, 1964 from George Weissman (Vice President of Philip Morris) to Joseph Cullman 3rd (President of Philip Morris and on the executive committee of the Tobacco Institute) regarding the "Surgeon General's Report" wherein it states "we must in the near future provide some answers which will give smokers a psychological crutch and a self-rationale to continue smoking";

q.  An internal review of the Surgeon General's Report of 1964 by Helmut Wakeham, Vice President of Research and Development at Philip Morris, Inc., concluding that there was "little basis for disputing the findings [of the 1964 Surgeon General's Report] at this time";

r.  A confidential British American Tobacco document reporting on the company's 1964 visit with the heads of the major American tobacco companies, including Philip Morris and R.J. Reynolds, recounting the following concerning the influence of the lawyers in the conspiracy: "In consequence of the importance of the lawsuits, the main power in the smoking and health situation undoubtedly rests with the lawyers, and more particularly with the Policy Committee of lawyers. The members of this committee are – Henry Ramm (Reynolds Chairman) - Cy. Hetsko (A.T.Co.) - Add. Yeaman (Brown & Williamson) – Paul Smith (PM)[...]." The report concluded: "This Committee is extremely powerful; it determines the high policy of the industry on all smoking and health matters- research and public relations matters, for example, as well as legal matters- and it reports directly to the Presidents.";

s.  A public statement issued by the Tobacco Institute on October 21, 1966, two years after issuance of the 1964 Surgeon General's Report, stating that the tobacco industry knew "of no valid scientific evidence demonstrating that either 'tar' or nicotine is responsible for any human illness";

t.  A statement on October 3, 1967, by Paul D. Smith, Vice President and General Counsel of Philip Morris, that "The truth of the matter is this: No one knows whether cigarette smoking causes any human disease or in any way impairs human health," and that "[n]obody has yet been able to find any ingredient as found in tobacco or smoke that causes human disease";

u.  In November 1967, at the direction of outside lawyers, the Tiderock Corporation, the Tobacco Institute's public relations firm, prepared an action plan titled "The Cigarette Controversy." The action plan proposed to influence public opinion by creating specific initiatives to re-open the "open question" cigarette controversy. The program called for the creation of a position paper for intra-industry use as well as one for distribution to the media and public. The plan included targeted categories for mailings such as the medical profession, scientists, communicators (press, radio, television), educators, top public figures, and 10,000 top corporate presidents. It also detailed the publication of magazine articles;

v.  A memorandum dated April 15, 1968, from William Kloepfer, Vice President of Public Relations for the Tobacco Institute to Earle Clements, President of the Tobacco Institute stating, "Our basic position in the cigarette controversy is subject to the charge, and maybe subject to a finding, that we are making false or misleading statements to promote the sale of cigarettes";

w.  The publication of an article in 1968, paid for by co-conspirators, entitled "To Smoke or Not to Smoke – That is Still the Question," in *True* magazine, which was designed to appear as legitimate article by a genuine author. The article was in fact written by a sports writer who was also employed by Hill and Knowlton, the public relations firm behind the creation of TIRC. This article deliberately misstated the known dangers of smoking;

x.  Notification by Philip Morris Senior Scientist Dr. Helmut Wakeham to Philip Morris senior management on January 10, 1969, that "[n]ow we have a study of the effect of smoking in pregnancy which supports previous conclusions that smoking mothers produce smaller babies," and that the medical field recognized that "smaller babies suffer detrimental effects all through life," including "lower intelligence test scores at age 10";

y.  A 1969 Brown & Williamson internal document which states "doubt is our product since it is the best means of competing with the "body of facts" that exists in the mind of the general public.  It is also the means of establishing a controversy.";

z.  A report on December 8, 1970, by Philip Morris researcher Dr. Helmut Wakeham to Philip Morris President Joseph Cullman III on the Council for Tobacco Research program, which was publicly described as a funding source for independent research on tobacco and health, stating: "It has been stated that CTR is a program to find out 'the truth about smoking and health.' What is truth to one is false to another. CTR and

the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes disease.";

aa. A false statement on January 3, 1971, by Joseph Cullman III, President of Philip Morris that "We do not believe that cigarettes are hazardous; we don't accept that. But we are working with the government, working very hard with the government, on various methods of ascertaining whether or not cigarettes can be found to be hazardous … I believe they have not been proved to be unsafe";

bb. A false statement on January 3, 1971, by Joseph Cullman III, President of Philip Morris that "[I]t's true that babies born to women who smoke are smaller, but they are just as healthy as the babies born to women who do not smoke. Some women would prefer to have smaller babies";

cc. A press release dated November 15, 1971, in which the Tobacco Institute falsely stated, in addressing whether smoking adversely affects the health of pregnant women, that "We just don't know, and only further research on smoking and all the other possible factors that may affect pregnancy will answer the question";

dd. An internal memorandum dated April 14, 1972 from Claude Teague (Assistant Director of Research for R.J. Reynolds) that states "happily for the tobacco industry, nicotine is both habituating and unique its variety of physiological actions, hence no other active material or combination of materials provides equivalent "satisfaction." The memo goes on to state that "we have deliberately played down the role of nicotine, hence the non-smoker has little or no knowledge of what satisfactions it may offer him, and no desire to try it. Instead, we must convince him with wholly irrational reasons that he should try smoking, in the hope that he will for himself then discovery the real "satisfactions" obtainable.";

ee. A 1972 memorandum to Horace Kornegay, president of the Tobacco Institute, stated that for 20 years the industry had employed a single strategy to defend itself on three major fronts: litigation, politics, and public opinion. The author noted that "it has always been a holding strategy, consisting of "creating doubt about the health charge without actually denying it -- advocating the public's right to smoke, without actually urging them to take up the practice--encouraging objective scientific research as the only way to resolve the question of health hazard.";

ff. An updated version of the Tobacco Institute's "The Cigarette Controversy," published in 1974, stating that a causal relationship between smokers and illness or death had not been established and that such claims were unproven;

gg. A 1976 interview of James Bowling, Vice President of Philip Morris, wherein he stated "I wouldn't be in the business if I thought cigarettes were harmful to people. I think it is important that there be a lot of us around who are trying to keep the research honest and open. I think the real dishonesty is telling people things that are not so."

hh. A 1976 interview of Helmut Wakeham, Vice President of Science and Technology at Philip Morris wherein he stated "If the company, as a whole, believed that cigarettes were really harmful, we would not be in the business. We are a very moralistic

company. I think the management of Philip Morris is sincere in this position. I think there is a great deal of doubt as to whether or not cigarettes are harmful."

ii. A pamphlet issued in 1978 by the Tobacco Institute, stating that "The flat assertion that smoking causes lung cancer and heart disease and that the case is proved is not supported by many of the world's leading scientists.";

jj. Articles in *The Tobacco Observer*, circulated by the Tobacco Institute, perpetuating the industry's denials of causation and harm from smoking. One headline announced, "Smoke not harmful to average non-smoker" (October 1978). In the May 1976 issue, one headline read "No Simple Answers; Research Disputes UPI"; and another stated, "no cause and effect relationship between cigarette smoking and pulmonary emphysema has been established";

kk. A November 1978 CTR memorandum acknowledged the existence of an "ad hoc" committee, made up of representatives of legal, public relations, and research executives of the major tobacco companies, who were working together to plan the industry's response to the "smoking and health" issue. This same memorandum noted that trade organizations such as CTR have been used as a tobacco industry "shield" in response to increasing reports of smoking related disease since the 1950s.

ll. A pamphlet published by the Tobacco Institute in 1979 titled "TOBACCO from seed to smoke amid controversy," stating falsely: "it has not been established that smoking causes any human disease";

mm. William L. Dunn, a Philip Morris scientist, wrote in a 1980 document titled "The Nicotine Receptor Program" that, despite the fact that the psychopharmacology of nicotine is "where the action is for those doing fundamental research on smoking," and where "most likely will come significant scientific developments profoundly influencing the industry, . . . it is where our attorneys least want us to be. . . .";

nn. A false statement by R.J. Reynolds Chairman and CEO Edward Horrigan in 1982 that "science to date after much research including over $100 million funded by our industry, indicates that no causal link [between smoking and human disease] has been shown," and that "there is absolutely no proof that cigarettes are addictive.";

oo. A national advertising campaign undertaken by R. J. Reynolds in 1984, which asserted that "[S]tudies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary.";

pp. In 1984 R.J. Reynolds Chairman and CEO Edward Horrigan, as part of a panel discussion on the "Nightline" television program, stated that: (1) "It is not known whether cigarettes cause cancer,"; (2) "Despite all the research to date, there has been no causal link established [between smoking and emphysema]"; and (3) "As a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over 10 years that would say, again, that science is still puzzled over these forces.";

qq. A December 31, 1985, memorandum from Reynolds' outside counsel indicated that "[a]fter the 1964 Surgeon General's report came out, the Law Department influenced research objectives to a degree, because the lawyers did not want anyone performing

research that would appear to acknowledge that cigarettes or cigarette smoke contained harmful constituents or posed a health problem.";

rr. A 1985 publication issued by R.J. Reynolds, entitled "Of Cigarettes and Science," falsely stating that cigarettes do not cause heart disease, which was the subject of an F.T.C. charge of false advertising; and

ss. Statements to Congress by the executives of Philip Morris, R.J. Reynolds and their co-conspirators falsely denying the addictiveness and dangerousness of cigarettes. For example, in 1994 R.J. Reynolds' then Chairman and CEO, James Johnston testified that cigarettes and nicotine clearly do not meet the classic definitions of addiction, after R.J. Reynolds engaged in national media campaign to further mislead the public as to the addictiveness of cigarettes.[1]

67. Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers made the above false representations despite their internal acknowledgment, based on scientific evidence, including evidence developed by Philip Morris, R.J. Reynolds, and other cigarette manufacturers, that nicotine is addictive and is the principle reason why people, including Patricia Fitzgerald, continued to smoke. Rather than publicly acknowledging what they knew for years – that the primary effect of nicotine is to provide "physiological satisfaction" for the smoker that leads to and sustains addiction – Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers deliberately misrepresented the scientific consensus concerning addictiveness of nicotine.

68. Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers deliberately concealed knowledge that the tar and nicotine delivery "Light," "Ultra Light," "Low Tar," and filtered cigarettes was not substantially different from that of "Full Flavor" cigarettes. These efforts to conceal and diminish the dangers of filtered, "Light," "Ultra Light," or "Low Tar" cigarettes were made in spite of – or perhaps because

---

[1]     There are many other acts in furtherance of the conspiracy engaged in by Defendants. Plaintiff reserves the right at trial to introduce additional acts in furtherance of the conspiracy.

of – knowledge that consumers, including Patricia Fitzgerald, purchased such cigarettes under the mistaken belief that they were a healthier or safer option.

69. Each conspirator knew or, in the exercise of reasonable care, should have known about the conduct of the others and about the common tortious scheme.

70. Patricia Fitzgerald was deceived by this conspiratorial campaign of disinformation and deception and suffered from lung cancer as a result. Among other things, had she been told what the co-conspirators knew about the dangers and addictiveness of smoking, she never would have started smoking in the first place. Had Patricia Fitzgerald been told that filtered and "Light" cigarettes were not delivering her less tar and nicotine, she would have made earlier and more persistent efforts to quit.

71. As a direct and proximate result of Philip Morris' and R.J. Reynolds' role in the conspiracy to deceive the public about the harmful effects of smoking cigarettes, Patricia Fitzgerald developed lung cancer, resulting in pain and suffering, mental anguish, expense of medical and/or nursing care and treatment, and other losses for which Plaintiff is entitled to recover the damages sought in this Complaint.

COUNT V
*Fraud and Misrepresentation*
(Against Philip Morris and R.J. Reynolds)

72. Plaintiffs restate and incorporate herein the foregoing paragraphs of their Complaint.

73. Philip Morris and R.J. Reynolds, directly and through their lawyers, their trade organizations, and other cigarette manufacturers made representations and statements about the safety of cigarettes and their effect on human health and addiction, as described in this Complaint. Such statements and representations were materially false, incomplete, and fraudulent at the

time Philip Morris and R.J. Reynolds made them and Philip Morris and R.J. Reynolds knew or had reason to know of their falsity.

74. At all times relevant to this Complaint, Philip Morris and R.J. Reynolds intentionally, willfully, and/or recklessly misrepresented and/or failed to disclose material facts about the human health hazards of smoking cigarettes, including addiction.

75. Philip Morris' and R.J. Reynolds' fraudulent misrepresentations include, but are not limited to, claims that certain brands and types of "Light" or filtered cigarettes would reduce the health risks of smoking. Philip Morris and R.J. Reynolds falsely, fraudulently, and with intent to defraud made such representations and statements about the safety of its cigarettes and their effect on human health and addiction. Philip Morris and R.J. Reynolds knew or should have known of the falsity of such claims during the time Patricia Fitzgerald smoked such cigarettes.

76. Philip Morris and R.J. Reynolds had a duty to disclose to the purchasers of its products, including Patricia Fitzgerald, all material facts about the health hazards of smoking their cigarettes, including their highly addictive qualities and that "Lights" cigarettes and other filtered, "Light," and "Ultra Light" cigarettes were no healthier than "regular" cigarettes. Such duty to disclose on the part of Philip Morris and R.J. Reynolds arose because they were and are in the business of selling cigarettes and by virtue of their affirmative conduct as more specifically described in this Complaint.

77. Because of Philip Morris' and R.J. Reynolds' knowledge of the material facts about smoking, health, and addiction, and their making of partial and incomplete statements about this issue, Philip Morris and R.J. Reynolds had a duty to reveal all of the material facts of which they were on notice, in order not to deceive and mislead consumers, including Patricia Fitzgerald.

Philip Morris' and R.J. Reynolds' nondisclosure, and their disclosure of fragmentary information and half-truths, constitutes actionable misrepresentation.

78. Philip Morris and R.J. Reynolds sought to induce the public's reliance, including the reliance of Patricia Fitzgerald, knowing that the public was in a vastly inferior, unequal, and/or disadvantaged position to discover these material facts.

79. The facts concealed by Philip Morris, R.J. Reynolds, their lawyers, their trade organizations, and other cigarette manufacturers about smoking, health, and addiction were material in that a reasonable consumer would have considered them important in deciding whether to purchase and smoke cigarettes, including Winston, True, Newport, Marlboro, Parliament, and Chesterfield brand cigarettes.

80. Patricia Fitzgerald reasonably relied on Philip Morris' and R.J. Reynolds' materially false, incomplete, and misleading misrepresentations about smoking, health, and addiction, and/or Philip Morris' and R.J. Reynolds' nondisclosure of the material facts about cigarette smoking and human health, including addiction, and was thereby induced to purchase, smoke, and become addicted to a deadly and defective product, to her detriment. Because of the pervasiveness of the tobacco industry campaign to hide the truth, Patricia Fitzgerald's detrimental reliance may also be inferred.

81. As a direct and proximate result of Philip Morris' and R.J. Reynolds' fraudulent misrepresentations and active concealment, Patricia Fitzgerald developed lung cancer, resulting in pain and suffering, mental anguish, expense of medical and/or nursing care and treatment, and other losses for which Plaintiff is entitled to recover the damages sought in this Complaint.

## COUNT VI
*Loss of Consortium*
(Against All Defendants)

82. Plaintiffs restate and incorporate herein the foregoing paragraphs of their Complaint.

83. As a direct and proximate result of the Defendants' wrongful acts, Plaintiff Thomas Fitzgerald has suffered loss of consortium and companionship of his wife Patricia Fitzgerald, as a result of the damages she has suffered as a result of her lung cancer. Such injuries include, but are not limited to, Patricia Fitzgerald's struggles with participating in the life of their family while going through cancer treatment and her continued physical weakness.

84. Plaintiff Thomas Fitzgerald has been deprived of the full care, comfort, society, and companionship of his wife as a result of the injuries that she sustained arising from the Defendants' negligence and other wrongful acts or omissions as described in this Complaint, and he demands judgment against all defendants in an amount just and appropriate together with interest and costs.

### Prayer for Relief

Plaintiffs request judgment against all Defendants for compensatory and multiple damages for all injuries and losses described above, including, but not limited to:

A) Patricia Fitzgerald's conscious pain and suffering and her medical expenses;

B) Patricia Fitzgerald's lost earnings;

C) Thomas Fitzgerald's loss of the reasonably expected net of income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of his wife Patricia Fitzgerald, had she not contracted lung cancer from smoking-related injuries;

D) All recoverable costs of this action; all legally recoverable interest; and

E) Any other relief the Court deems just and proper.

## *DEMAND FOR JURY TRIAL*

Plaintiffs demand a trial by jury of all claims so triable.

Respectfully submitted,

*/s/ Meredith K. Lever*
Andrew A. Rainer, BBO #542067
Meredith K. Lever, BBO #691953
Juliana T. Shulman-Laniel, BBO #704165
PUBLIC HEALTH ADVOCACY INSTITUTE
360 Huntington Avenue, #117CU
Boston, MA 02115
(617) 373-8066
arainer@phaionline.org
meredith@phaionline.org
Dated: October 26, 2020            juliana@phaionline.org

Respectfully submitted,

*/s/ Kevin K. Donovan*
Kevin K. Donovan, BBO# 687899
Rubenstein Law
9130 S. Dadeland Blvd
Miami, FL 33156
(305) 661-6000
Dated: October 26, 2020            kdonovan@rubensteinlaw.com

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 2081CV02586 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| | |
|---|---|
| **PLAINTIFF(S):** Patricia Fitzgerald and Thomas Fitzgerald | **COUNTY** |
| **ADDRESS:** 81 Walnut Street | Middlesex |
| Reading, MA 01867 | **DEFENDANT(S):** Philip Morris USA, Inc. |
| | R.J. Reynolds Tobacco Company |
| **ATTORNEY:** Andrew Rainer, Meredith Lever, Juliana Shulman-Laniel | DeMoulas Super Markets, Inc. |
| **ADDRESS:** Public Health Advocacy Institute | **ADDRESS:** Philip Morris USA, 6601 W. Broad Street, Richmond, VA 03230 |
| 360 Huntington Avenue, 117CU | R. J. Reynolds, 401 N. Main Street, Winston-Salem, NC 27101 |
| Boston, MA 02115 | DeMoulas, 875 East Street, Tewksbury, MA 01876 |
| **BBO:** Rainer #542067; Lever #691853; Shulman-Laniel #704165 | |

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B08 | Wrongful Death (non-medical) | A | ☒ YES ☐ NO |

**\*If "Other" please describe:**

| Is there a claim under G.L. c. 93A? ☐ YES ☒ NO | Is this a class action under Mass. R. Civ. P. 23? ☐ YES ☒ NO |
|---|---|

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ................................................................ $_____
    2. Total doctor expenses ................................................................. $_____
    3. Total chiropractic expenses ......................................................... $_____
    4. Total physical therapy expenses ................................................. $_____
    5. Total other expenses (describe below) ....................................... $_____
                              Subtotal (A): $ > 10 million

B. Documented lost wages and compensation to date ................................ $_____
C. Documented property damages to date ................................................. $_____
D. Reasonably anticipated future medical and hospital expenses ............... $_____
E. Reasonably anticipated lost wages ...................................................... $_____
F. Other documented items of damages (describe below) ........................... $_____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

                                  TOTAL (A-F): $ > 10 million

### CONTRACT CLAIMS
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

                                  TOTAL: $_____

Signature of Attorney/ Unrepresented Plaintiff: X *Juliana T. Shulman-Laniel*    Date: 10/26/2020

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X *Juliana T. Shulman-Laniel*    Date: 10/26/2020

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**AC Actions Involving the State/Municipality \***

AA1 Contract Action involving Commonwealth,
    Municipality, MBTA, etc. (A)
AB1 Tortious Action Involving Commonwealth,
    Municipality, MBTA, etc. (A)
AC1 Real Property Action involving
    Commonwealth, Municipality, MBTA. (A)
AD1 Equity Action Involving Commonwealth,
    Municipality, MBTA, etc. (A)
AE1 Administrative Action involving
    Commonwealth, Municipality, MBTA,etc. (A)

**CN Contract/Business Cases**

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal
    Affairs of Entities (A)
BA3 Liability of Shareholders, Directors,
    Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of
    Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade
    Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade
    Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

\* Choose this case type if ANY party is the
Commonwealth, a municipality, the MBTA, or any
other governmental entity UNLESS your case is a
case type listed under Administrative Civil Actions
(AA).

† Choose this case type if ANY party is an
incarcerated party, UNLESS your case is a case
type listed under Administrative Civil Actions (AA)
or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

**PA Civil Actions Involving Incarcerated Party †**

PA1 Contract Action involving an
    Incarcerated Party (A)
PB1 Tortious Action involving an
    Incarcerated Party (A)
PC1 Real Property Action involving an
    Incarcerated Party (F)
PD1 Equity Action involving an
    Incarcerated Party (F)
PE1 Administrative Action involving an
    Incarcerated Party (F)

**TR Torts**

B03 Motor Vehicle Negligence - Personal
    Injury/Property Damage (F)
B04 Other Negligence - Personal
    Injury/ Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

**RP Summary Process (Real Property)**

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/
    Non-residential (F)

**RP Real Property**

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

**MC Miscellaneous Civil Actions**

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

**AB Abuse/Harassment Prevention**

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E(X)

**AA Administrative Civil Actions**

E02 Appeal from Administrative Agency,
    G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149,
    §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (A)
E24 Appeal from District Court
    Commitment, G.L. c.123, § 9(b) (X)
E25 Pleural Registry (Asbestos cases)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only,
    G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

**SO Sex Offender Review**

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

**RC Restricted Civil Actions**

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S(X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES   ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT
DOCKET NO. 2081CV02586

PATRICIA FITZGERALD and THOMAS
FITZGERALD,

     Plaintiffs,

v.

R.J. REYNOLDS TOBACCO COMPANY,
PHILIP MORRIS USA, INC., and
DEMOULAS SUPER MARKETS, INC.,

     Defendants.

## PLAINTIFF'S MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff respectfully moves this Honorable Court, pursuant to Rule 4C of the
Massachusetts Rules of Civil Procedure, that this Court appoint Suvalle Jordey and/or any of
their employees or servants as process server in this matter, qualified and knowledgeable persons
in the service of all court process, including but not limited to any and all service of process. The
undersigned swears to the best of their knowledge and belief, the person to be appointed is
eighteen years of age or over and is not a party to this case.

Respectfully submitted,
Plaintiff, by his attorneys,

_/s/ Juliana Shulman-Laniel_
Andrew A. Rainer, BBO #542067
Meredith K. Lever, BBO #691953
Juliana T. Shulman-Laniel, BBO #704165
PUBLIC HEALTH ADVOCACY INSTITUTE
360 Huntington Avenue, #117CU
Boston, MA 02115
(617) 373-8066
arainer@phaionline.org
meredith@phaionline.org

Dated: October 26, 2020      juliana@phaionline.org

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT
DOCKET NO. 2081CV02586

PATRICIA FITZGERALD and THOMAS
FITZGERALD,

      Plaintiff,

v.

PHILIP MORRIS USA, INC., R.J.
REYNOLDS TOBACCO COMPANY, and
CUMBERLAND FARMS, INC.

      Defendants.

## PLAINTIFFS' REQUEST FOR PRODUCTION TO PHILIP MORRIS USA, INC. AND R.J. REYNOLDS TOBACCO COMPANY

Pursuant to Mass. R. Civ. P. 34, Plaintiffs hereby request that Defendants, Philip Morris USA Inc. and R.J. Reynolds Tobacco Company, to produce for inspection and copying the documents described below.

## INSTRUCTIONS AND DEFINITIONS

### Instructions

1. You are requested to produce all documents and things responsive to the Requests for Production (the "Requests") stated below that are in your possession, custody, or control, including without limitation all that are in the possession, custody, or control of your employees, agents, servants, attorneys, consultants, or accountants, or any corporate or business entity controlled by you, regardless of the location of such documents.

2. Responsive documents shall be produced as they are kept in the usual course of business or organized and labeled to correspond with numbered Requests. To the extent that

1

responsive documents are available in electronic form, they shall be produced in native format, unless some other format is agreed upon by the parties. You are requested to produce all metadata associated with any electronic document produced.

3.  If you object to any of the Requests, the precise grounds for your objection(s) shall be stated with particularity and in accord with the requirements of Superior Court Rule 30A, paragraph 3 (entitled "Objections to Requests for the Production of Documents and Things"), which is incorporated by reference.

4.  If any objection rests in whole or in part on a claim of privilege, the privilege claimed shall be stated with particularity. With respect to any document responsive to any Request that is withheld from production on the grounds that the document or any of its contents is privileged or otherwise not subject to production, you are requested to provide a privilege log in strict compliance with the requirements of Mass. R. Civ. P. 26(b)(5).

5.  In the event that you object to or claim a privilege with respect to any Instruction or Request, in whole or in part, you are requested to produce all documents (or portions thereof) requested in that portion of the Request as to which you have no objection or claim of privilege. In addition, where a responsive document contains portions that you believe are protected from discovery, you must produce the document with the portion you claim to be protected redacted.

6.  If any document responsive to a Request was, but no longer is, in your possession, custody, or control, please identify that document and state whether any such document:(i) is missing or lost; (ii) has been destroyed; (iii) has been transferred voluntarily or involuntarily; or (iv) has been otherwise disposed of, and, in each instance, please explain in detail the circumstances surrounding any such disposition.

7. The Requests are continuing in nature, and you are requested to provide such additional documents as may hereafter be discovered or come into your possession, custody, or control. Plaintiff specifically requests that you supplement your responses to these requests as required under Mass. R. Civ. P. 26(e)(1) and (2). In any event, you are specifically requested to supplement your responses to these requests at the close of discovery pursuant to Mass. R. Civ. P. 26(e)(3).

8. The Requests are both general and specific and to the degree that a more specific Request seeks documents that also happen to be responsive to a more general Request, the more specific Request does not limit the breadth of documents which are requested by and responsive to the more general request.

## Definitions

1. Plaintiff incorporates by reference Superior Court Rule 30A, paragraph 1, Uniform definitions in discovery requests.

2. As used in these Requests, "and" and "or" shall be interpreted to mean "and/or" if to do so would cause more documents to be produced.

3. "Documents" as used in these Requests include, but is not limited to, all correspondence to and from R.J. Reynolds Tobacco Company or Philip Morris USA Inc., and without limitation, any and all other written materials (in electronic or paper form), which are in any way responsive to a particular request for production.

4. The term "date" shall mean the exact day, month, and year of an event if ascertainable, or if not, your best approximation thereof (including relationship to other events).

5. "Defendant's Cigarettes" means any brand of cigarette owned, distributed, and or manufactured by Defendants or those brands that Defendant currently manufacturers or distributes or otherwise possess an interest in.

6. "Sample Packs" means any free pack of cigarettes and can include without limitation packs of 4, 5, 20 or any other size or number of cigarettes.

7. "Sampling Time Period" means the period of time between 1957 and the present, inclusive.

**PLEASE PRODUCE LEGIBLE/AUDIBLE COPIES OF THE FOLLOWING DOCUMENTS:**

1. All letters written, sent by, or on behalf of R.J. Reynolds Tobacco Company to any school in the State of Massachusetts responding to inquiries from such school concerning the health effects of smoking cigarettes, from 1957 through 1975.

2. All letters written, sent by, or on behalf of Philip Morris USA Inc. to any school in the State of Massachusetts responding to inquiries from such school concerning the health effects of smoking cigarettes, from 1957 through 1975.

3. All documents concerning, or that memorialize, any oral statement made at any time by PATRICIA FITZGERALD or THOMAS FITZGERALD, excluding any deposition taken in this action.

4. All documents that you believe were authored by or otherwise memorializes the beliefs, opinions, or knowledge of PATRICIA FITZGERALD or THOMAS FITZGERALD, excluding pleadings and discovery responses in this action.

5. All documents concerning any communications sent by PATRICIA FITZGERALD to Defendants.

6. All documents created, generated, or obtained before this action was filed concerning, or which bears, the name or other personal identifying information for PATRICIA

FITZGERALD or THOMAS FITZGERALD, specifically including, but not limited to, customer lists, responses to promotional or other participatory marketing campaigns, correspondence, phone logs, etc.

7.  All documents in Defendants' possession, custody, or control concerning any of Defendants' Cigarette-related brand prizes, gear, or other items, including free samples of cigarettes sent to the addresses at which PATRICIA FITZGERALD resided.

8.  All documents concerning every instance for the sampling time period, in which your company (a) distributed, sampled, or otherwise made publicly available free cigarettes in Massachusetts and/or New Hampshire, or (b) distributed, sampled, or otherwise made publicly available any coupons, vouchers, or other similar means for obtaining free cigarettes in Massachusetts and/or New Hampshire.

9.  All documents in your possession, custody, or control, which were not generated or obtained in connection with this action, and which concerns or bears the name or other identifying information for PATRICIA FITZGERALD or THOMAS FITZGERALD.

10. All documents indicating, or tending to indicate that, or concerning whether, PATRICIA FITZGERALD purchased or otherwise obtained or consumed any tobacco product manufactured or distributed by your company, including its affiliates and predecessors in interest.

11. All documents indicating, or tending to indicate that, or concerning whether, PATRICIA FITZGERALD did not ever purchase or otherwise obtain or consume any tobacco product manufactured or distributed by your company, including its affiliates and predecessors in interest.

12. All documents indicating, or tending to indicate that, or concerning whether, PATRICIA FITZGERALD consumed any tobacco product not manufactured or distributed by your company, including its affiliates and predecessors in interest.

13. To the extent not already encompassed by a previous Request herein, all records maintained electronically or in any other format by Defendants, including any customer databases, that reflect the name of PATRICIA FITZGERALD and/or the nature of any contact between Mrs. Fitzgerald and Defendants regarding cigarettes.

FOR THE PLAINTIFFS,

*/s/ Meredith K. Lever*
Andrew A. Rainer, BBO #542067
Meredith K. Lever, BBO #691953
Juliana T. Shulman-Laniel, BBO #704165
PUBLIC HEALTH ADVOCACY INSTITUTE
360 Huntington Avenue, #117CU
Boston, MA 02115
(617) 373-8066
arainer@phaionline.org
meredith@phaionline.org
Dated: October 28, 2020                juliana@phaionline.org

*/s/ Kevin K. Donovan*
Kevin K. Donovan, BBO# 687899
Rubenstein Law
9130 S. Dadeland Blvd
Miami, FL 33156
(305) 661-6000
kdonovan@rubensteinlaw.com

Randy Rosenblum (admitted *Pro Hac Vice*)
Dolan, Dobrinsky, Rosenblum
2665 S. Bayshore Drive #603
Miami, FL 33133
rrosenblum@ddrlawyers.com

## CERTIFICATE OF SERVICE

I, Meredith K. Lever, hereby certify that on October 28, 2020 a true and accurate copy of the foregoing document was served by email by agreement upon all counsel of record in the above-captioned matter.

/s/ *Meredith K. Lever*
Meredith K. Lever

MIDDLESEX, ss

SUPERIOR COURT
DOCKET NO. 2081CV02586

PATRICIA FITZGERALD and THOMAS
FITZGERALD,

       Plaintiffs,

v.

PHILIP MORRIS USA, INC., R.J.
REYNOLDS TOBACCO COMPANY, and
CUMBERLAND FARMS, INC.

       Defendants.

## PLAINTIFFS' FIRST SET OF INTERROGATORIES PROPOUNDED UPON R.J. REYNOLDS TOBACCO COMPANY AND PHILIP MORRIS USA, INC.

The Plaintiffs in the above-captioned matter hereby propounds the following interrogatories to Defendants R.J. Reynolds Tobacco Company and Philip Morris USA, Inc. pursuant to Mass. R. Civ. P. 33.

### Instructions

1.      As used herein, the term "document" shall be understood to have the broadest possible scope permitted by Rule 34 of the Massachusetts Rules of Civil Procedure. It includes, without limitation, all writings (including original and all non- identical copies), correspondence, communications, memoranda, notes, desk calendars, diaries, letters, facsimiles, minutes, contracts, reports, studies, checks, invoices, statements, receipts, summaries, pamphlets, books, offers, notations of any conversation, telephone calls or meetings, bulletins, magazines, publications, printed matter, computer printouts, teletypes, worksheets, drawings, graphs, charts, photographs, transcriptions, telegrams, telex messages, recordings of telephone calls, electronic mail messages, text messages, videotapes, audio tapes, computer disks (whether hard disks or floppy discs, internal or external),

internet postings, and other data compilations from which information can be obtained, translated if necessary, through detection devices into reasonably usable form. The term "document" also includes data or documentation that is stored in a computer or in other electronic form, deleted but recoverable information, graphic or aural records or representations of any kind, and all drafts, versions, compilations, alterations, modifications, changes or amendments of any of the foregoing.

2.      The term "communication" means the transmittal of information (in the form of facts, opinions, ideas, inquiries, or otherwise).

3.      When referring to a natural person, to "identify" means to give, to the extent known, the person's (a) full name, (b) present or last known address, and (c) the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

4.      When referring to an entity, to "identify" means to give, to the extent known, (a) the entity's full name, including (when not apparent from the name) the nature of the entity, e.g., corporation, limited liability corporation, partnership, or professional corporation, (b) present or last known address of its headquarters or principal place of business, and (c) the state in which the entity is incorporated or otherwise created. Once an entity has been identified in accordance with this subparagraph, only the name of that entity need be listed in response to subsequent discovery requesting the identification of that entity.

5.      When referring to documents, to "identify" means to give, to the extent known: (a) the type of document; (b) the general subject matter; (c) the date of the document; ( d) the author or authors, according to the document; and (e) the persons to whom, according to the document, the document (or a copy) was to have been sent.

2

6. The term "plaintiff or "defendant," as well as a party's full or abbreviated name or a pronoun referring to a party, mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, and subsidiaries. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

7. The term "person" means any natural person or any business, legal, or governmental entity.

8. The term "concerning" means referring to, describing, offering evidence of, or constituting.

9. "Date" means the exact day, month and year, if ascertainable, or if not, the best approximation (including by relationship to other events).

10. "Child(ren)" means any individual(s) under the age of 18.

11. "Defendant's Cigarettes" means any brand of cigarette owned, distributed, and/or manufactured by Defendants or those brands that Defendant currently manufacturers or distributes or otherwise possess an interest in.

12. Except where the context does not permit, the word "and" and the word "or" shall be construed to mean "and/or."

13. Words used in the singular shall, except where the context does not permit, be deemed to include the plural. Words used in the plural shall, except where the context does not permit, be deemed to include the singular. The masculine gender shall, except where the context does not permit, be deemed to include the feminine and neutral gender.

14. These interrogatories, unless otherwise specified (as, for example, by use of the word "ever" or the phrase "at any time"), request information from 1956 to the present. To the extent that any answer varies with respect to any part of that period, a separate answer is requested for each such part, specifying the dates involved.

15. If exact data cannot be supplied in response to an interrogatory, you are requested to supply estimated data and any such estimated data must be designed as such and the basis, source or sources, and/or derivation of such estimate should be set forth separately.

16. These interrogatories shall be deemed to be continuing requests for supplemental answers pursuant to Massachusetts Rule of Civil Procedure 26(e), so as to require additional answers if you obtain further information between the time answers are served and the time of trial of this action.

17. If, in answering any of these interrogatories, you wish to assert or rely upon a privilege or any rule protecting against the disclosure of information, please specify the privilege or the rule of protection on which you rely and, if appropriate, provide a privilege log pursuant to Rule 26(b)(5).

## INTERROGATORIES

1. State the full name, address, and occupation of each person who has provided information used to answer any of these interrogatories.

2. Please identify all persons or entities known to you with information concerning any of the factual allegations set forth in the Plaintiff's Complaint including: a) Name; b) Last known address; c) Summary of information known by the person; d) Whether you or someone on your behalf has taken a written, oral, or other recorded statement of any witnesses. Such individuals include, but are not limited to, individuals who may have knowledge of PATRICIA FITZGERALD's smoking history or attempts to quit smoking.

3. Please describe in detail all the facts on which you rely for any assertion made by you in this matter that neither you, nor your agents nor third parties acting on your behalf marketed cigarettes to children in Massachusetts between 1957 and 1975.

4. Please describe in detail all the facts on which you rely for each Affirmative Defense set forth in your Answers and, to the extent you rely upon documents, the Bates numbers or, if none, a description sufficient to identify each document (for example, date, author(s), recipient(s), subject line).

5. Do you contend that PATRICIA FITZGERALD was negligent in connection with her smoking of cigarettes that contributed to her lung cancer? If so, please state with specificity the actions or inactions on the part of PATRICIA FITZGERALD that you contend constitute negligence that contributed to her lung cancer.

FOR THE PLAINTIFFS,

_/s/ Meredith K. Lever_
Andrew A. Rainer, BBO #542067
Meredith K. Lever, BBO #691953
Juliana T. Shulman-Laniel, BBO #704165
PUBLIC HEALTH ADVOCACY INSTITUTE
360 Huntington Avenue, #117CU
Boston, MA 02115
(617) 373-8066
arainer@phaionline.org
meredith@phaionline.org
juliana@phaionline.org

Dated: October 28, 2020

_/s/ Kevin K. Donovan_
Kevin K. Donovan, BBO# 687899
Rubenstein Law
9130 S. Dadeland Blvd
Miami, FL 33156
(305) 661-6000
kdonovan@rubensteinlaw.com

Randy Rosenblum (admitted _Pro Hac Vice_)
Dolan, Dobrinsky, Rosenblum
2665 S. Bayshore Drive #603
Miami, FL 33133
rrosenblum@ddrlawyers.com

## CERTIFICATE OF SERVICE

I, Meredith K. Lever, hereby certify that on October 28, 2020 a true and accurate copy of the foregoing document was served by email by agreement upon all counsel of record in the above-captioned matter.


_/s/ Meredith K. Lever_____
Meredith K. Lever

PHILIP MORRIS USA, INC.
C/O CAPITOL CORP SERVICES
44 SCHOOL STREET, SUITE 505
BOSTON, MA

S&C